UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES,

     Plaintiff,

v.                                CASE NO. 8:18-cv-2726-T-23TGW

WILLIAM PLANES, et al.,

     Defendants.

_____/

## FINDINGS OF FACT, CONCLUSIONS OF LAW, PRELIMINARY INJUNCTION, AND ORDER

In 2016, the United States sued Regina Planes and claimed that South Capital Construction, Inc., controlled by William Planes, had failed to pay employment taxes and, while tax liability mounted, fraudulently transferred about $600,000 to Regina Planes. (Doc. 1 at ¶¶ 22–24) Before the lawsuit and to escape liability for South Capital's employment taxes, Regina Planes denied under oath to the IRS that she was a "financially responsible officer" of South Capital. But, attempting to defend against the United States' fraudulent transfer claim, Regina Planes contradicted her statement to the IRS, affirmed that she was a financially responsible officer, and asserted that South Capital paid her for meaningful services. The district court found "very troubl[ing]" Mrs. Planes's "repeated efforts at trial to undermine prior sworn testimony" and found unconvincing Regina Planes's attempt to explain

that work performed at a school and a veterinary center "was actually on behalf of a construction company." (*United States v. South Capital*, 8:16-cv-705, Doc. 139 at 6)

After a bench trial, the district court in *South Capital* entered a $622,226 judgment against Regina Planes and found that the Planeses — to defeat tax collection — had "intentionally" engineered the following "fraudulent" scheme:

> By managing the [the Planeses'] businesses while retaining no ownership interest in them, Mr. Planes ensured that he would be the person assessed with trust fund recovery penalties. However, by placing the assets in Mrs. Planes's name, the couple also ensured that Mr. Planes lacked funds to satisfy the penalties. This structure has allowed the couple to accrue substantial liabilities that have been virtually impossible to collect.

(*South Capital*, Doc. 139 at 6)

In this action, the United States sues (Doc. 1) to disregard the corporateness of entities on which William and Regina Planes allegedly rely to thwart tax collection. A temporary restraining order (Doc. 6) prohibits the Planeses — and anyone acting on behalf or in concert with the Planeses — from transferring the entities' assets. Two hours after an IRS agent served Regina Planes with the temporary restraining order, William Planes transferred $160,000 — 99% of the entities' money — to a third-party. A contempt hearing followed.

Although I received the evidence — and arrived at my conclusions in this action without consideration of the *South Capital* action, the evidence in this action clearly and convincingly establishes that the Planeses manifest the same penchant for eluding, and the same willingness to elude, creditors that was revealed in the *South Capital* action. In other words, the Planeses are "at it again." The details follow.

# BACKGROUND

Under 26 U.S.C. § 6672, an employer who willfully fails to remit an employee's withholding to the IRS is liable to pay a "trust fund recovery penalty." From 2000 to 2012, at least ten entities managed by William Planes failed to remit employee withholdings, and the IRS has assessed William Planes with trust fund recovery penalties exceeding $9,000,000. (Doc. 1 at ¶¶ 132–229)

The United States alleges that William Planes has hidden the Planes's assets, which include several companies, properties, and vehicles, by scattering title among Regina Planes and a network of LLCs owned by two irrevocable trusts, which William Planes allegedly formed a day after the IRS assessed William Planes with a $529,000 tax penalty. (Doc. 1 at ¶ 9) Although the trust formation documents limit the Planeses' ability to spend the trusts' assets, William Planes allegedly ignores the limits, disregards the corporateness of the trusts and the LLCs, and treats the trusts' assets as unencumbered personal property. (Doc. 1 at ¶ 51) Also, the United States alleges that the Planeses funnel the trusts' assets to Quality Holdings of Florida, Inc., which Regina Planes wholly owns. (Doc. 1 at ¶ 51)

On November 5, 2018, the United States sued (Doc. 1) to reduce William Planes's tax liability to judgment; to disregard the corporateness of the trusts, the LLCs, and Quality Holdings; and to apply the entities' assets to the judgment. A November 6, 2018 order (Doc. 6) grants the United States' motion for a temporary restraining order, enjoins the Planeses from transferring the entities' assets, and

schedules for November 19, 2018, a hearing on the United States' motion for a preliminary injunction.

A business day before the preliminary-injunction hearing, the defendants filed (Doc. 14) an emergency motion to continue the hearing to January 2019 and stipulated (Doc. 15) to the temporary restraining order's remaining in effect until further order. A November 16, 2018 order (Doc. 28) grants the emergency motion. At the conclusion of the hearing, the parties agreed to mediate. After an eighty day delay for mediation, the mediator declared (Doc. 137) an impasse, and the parties supplemented (Docs. 144, 152, 171) the preliminary-injunction briefing.

During the pendency of the mediation, the United States moved (Doc. 127) for an order requiring the defendants to explain why William Planes's transferring $160,000 from three LLCs to Coast-to-Coast was not contemptuous of the temporary restraining order. The United States appended to the motion evidence showing that (1) at about 1:00 p.m. on November 7, 2018, an IRS Officer served Regina Planes with the temporary restraining order, (2) at 1:41 p.m. Regina Planes attempted to call William Planes, (3) at 1:43 p.m. William Planes called and spoke with Regina Planes for seven minutes, (4) at 1:50 p.m. William Planes tried three times to call two lawyers, (5) at 1:55 p.m. William Planes called and spoke with Regina Planes for five minutes, and (6) at 3:20 p.m. William Planes transferred to Coast-to-Coast $160,000 from three LLCs bound by the temporary restraining order. (Doc. 127 at 3–4)

The United States argues that the rapid calls to his lawyers and the timing and amount of the transfer demonstrate that William Planes learned about the temporary restraining order during the 1:43 p.m. call with Regina Planes. Also, the United States contends that Coast-to-Coast's receiving the transfer and later spending the transferred money constitutes contempt. The United States claims that William Planes has created within Coast-to-Coast a "slush fund" on which William Planes draws to lease luxury automobiles, to pay for household maintenance, and to pay the Planeses' legal expenses. (Doc. 127 at 5–6) Further, the United States contends that, because William Planes is a director of Coast-to-Coast and used a Coast-to-Coast email account to transfer the money, the agent-principal relation imputes to Coast-to-Coast knowledge about the temporary restraining order. (Doc. 127 at 7)

Finally, the United States contends that Gene Santella's receiving payment from Coast-to-Coast constitutes contempt. The United States asserts that Santella — the owner and president of Coast-to-Coast — learned about the temporary restraining order before the transfer, knew that William Planes contemptuously transferred the $160,000, and knew that Coast-to-Coast paid Santella with "frozen assets." (Doc. 127 at 5) The United States requests (Doc. 127) an order finding William Planes, Santella, and Coast-to-Coast in contempt and compelling Santella and Coast-to-Coast to repay the $160,000.

An April 15, 2019 order (Doc. 141) grants the United States' motion and requires William Planes, Santella, and Coast-to-Coast to explain why the $160,000

transfer and later payments were not contemptuous of the temporary restraining order. William Planes responds (Doc. 163) that Regina Planes never told him about the temporary restraining order. Santella and Coast-to-Coast respond (Doc. 162) that neither learned about the temporary restraining order until the day after the transfer and that the spending by Coast-to-Coast — an entity not mentioned in the temporary restraining order — cannot constitute contempt.

## FINDINGS OF FACT

An assessment of both the evidence presented and the credibility of the witnesses at the June 5, 2019 evidentiary hearing yields the following findings.

### The Transaction and the Temporary Restraining Order

The United States has assessed against William Planes tax penalties exceeding $9,300,000. (Tr. at 121:4–9) On May 6, 2003, a day after the IRS assessed a $529,000 tax penalty against William Planes, the Planeses created the William Planes 2003 Irrevocable Trust and the Regina M. Planes 2003 Irrevocable Trust. (Tr. at 156:20–22; Doc. 3-7 at 2, 11) The trusts collectively own six LLCs: Corklico LLC, 3-22-18 LLC, 2801 Corner Holdings LLC, 32801-15 Holdings LLC, 2801 Keystone LLC, and Trinity Corner LLC. (Docs. 3-3, 3-4, 3-5) William Planes is the manager and CEO of Corklico LLC, and Santella is the manager of 2801 Keystone LLC, 2801 Corner Holdings, and 32801-15 Holdings LLC. (Docs. 5-16; 63 at 19–22) Also, Regina Planes wholly owns Quality Holdings of Florida, Inc., which ceased business in 2016. (Doc. 3-13) Bank records and other

documents reveal that William Planes directs the LLCs' business, which primarily comprises renting, leasing, and selling real property.

On November 1, 2018, William Planes sold an office building in Palm Harbor, Florida.  (Tr. at 136:13–23)  On November 2, 2018, the purchaser wired $213,611.45 to 2801 Corner Holdings.  (Doc. 127-10)  On November 2, 2018, William Planes transferred from 2801 Corner Holdings $101,000 to 32801-15 Holdings and $20,000 to 2801 Keystone.  (Docs. 127-9 at 2; 127-11 at 2)

On November 5, 2018, the United States sued (Doc. 1) to reduce to judgment the taxes assessed against William Planes and to disregard the corporateness of the trusts, the LLCs, and Quality Holdings.  The same day, the United States moved (Docs. 3, 5) for a temporary restraining order and a preliminary injunction.

A November 6, 2018 order (Doc. 6) grants the United States' motion for a temporary restraining order and states:

> Effective **NOVEMBER 6, 2018**, the defendants—as well as anyone acting on their behalf or in concert or participation with them—are enjoined from directly or indirectly encumbering, liquidating, transferring, spending, diminishing, or otherwise disbursing the assets of any of the following entities:
>
> A)  The William Planes 2003 Irrevocable Trust;
> B)  The Regina M. Planes 2003 Irrevocable Trust;
> C)  Corklico LLC;
> D)  3-22-18 LLC;
> E)  2801 Corner Holdings LLC;
> F)  32801-15 Holdings LLC;
> G)  2801 Keystone LLC;
> H)  Trinity Corner LLC; and
> I)  Quality Holdings of Florida Inc.

**Morris serves Regina Planes**

At the June 5, 2019 hearing, Bryan Morris, an IRS Revenue Officer, testified about serving Regina Planes with the temporary restraining order. On November 7, 2018, Morris drove to the Planeses' residence in Tarpon Springs, Florida. (Tr. at 13:2–3) Soon after arriving at the Planeses' residence, Morris saw an SUV backing-out the garage. (Tr. at 13:5–6) Morris walked toward the SUV, and the driver stopped the SUV and lowered the driver's side window. (Tr. at 13:7–8) Morris asked the driver whether she was Regina Planes, and Regina Planes responded "Yes." (Tr. at 13:9) Morris stated that he had "some documents for [Regina Planes] from the Department of Justice" and asked Regina Planes "whether she would accept service of the documents for herself, for Mr. Planes, . . . and [for] Ana Planes." (Tr. at 14:6–8) Regina Planes responded that she would accept the documents and instructed Morris to place the documents in the trunk of the SUV. (Tr. at 14:8–10) Morris struggled to find the latch to open the trunk, and Regina Planes exited the SUV and pulled the latch. (Tr. at 14:11–14) While Regina Planes opened the trunk, Morris retrieved three binders, each of which contained a copy of the complaint, the summons, and the temporary restraining order. (Tr. at 11:20–22) The exterior of each binder displayed a cover sheet, and the center of each cover sheet bore the words "**TEMPORARY RESTRAINING ORDER**" in an uppercase, bold, 65-point font. (Doc. 187-1) The extraordinary 65-point font required that "**TEMPORARY**," "**RESTRAINING**," and "**ORDER**" each appear on a separate

line.  (Doc. 187-1)  In the center of each cover sheet on each binder these words appeared — exactly like this:

# TEMPORARY RESTRAINING ORDER

(*See* Doc. 187-1)  With Regina Planes in his immediate presence, Morris placed the three binders in the trunk of the SUV and arranged the binders next to each other, and the cover sheet of each binder remained visible.  (Tr. at 26:9–21)

Morris testified that after placing the binders in the trunk Regina Planes "noticed" the words "**TEMPORARY RESTRAINING ORDER**" and asked Morris, "What is this restraining order about?"  (Tr. at 27:24–25)  Morris responded that he "did not know and that the documents in the binders contained [the] name of the Department of Justice attorney who was assigned to the matter."  (Tr. at 28:8–11) Regina Planes asked, "Who was the Department of Justice attorney?"  Morris responded "Mr. Silverblatt," and Regina Planes replied, "He's an asshole."  (Tr. at 28:13–19)

**Regina Planes denies seeing the cover sheet**

Regina Planes testified that she opened the trunk, returned to the driver's seat, and drove to her dance class — all without seeing the cover sheet of a binder. (Tr. at 181:22–25)  Regina Planes testified that she largely disregarded the service because she assumed that Morris was a "courier" delivering copies of documents pertinent to the *South Capital* action, in which months earlier the United States — represented by Silverblatt — obtained a judgment against Regina Planes. (Tr. at 179:22–8)  Although she did not explicitly deny asking Morris about the temporary restraining order, Regina Planes testified that she learned the following weekend about the order.  (Tr. at 201:6–15)  The remainder of Regina Planes's testimony largely corroborates Morris's testimony except Regina Planes denies remembering the question — "What is this restraining order about?" — that prompted Morris to mention Silverblatt's name.  (Tr. at 194:8–13; 195:15–196:14)

**Credibility**

An assessment of the testimony and the demeanor of Regina Planes and Morris confirms that Morris enjoys a lopsidedly superior credibility.  Morris evidenced a conscientious effort to state his recollection with candor, deliberation, precision, and clarity.  In contrast Regina Planes harbors a self-interested motive to deny knowing about the temporary restraining order and to deny telling William Planes about the order.  No one even slightly undermined Morris's credibility or meaningfully challenged Morris's recollection or proffered a reason for Morris to lie.

Particularly convincing is Morris's attributing to Regina Planes the question "What is this restraining order about?" Three times during his testimony Morris affirmed his recollection that Regina Planes "specifically" asked Morris about the temporary restraining order, and each affirmation was consistent. (Tr. at 14:14–15, 16:2–3, 16:12, 27:5, 27:22–23, 28:1–3) Further, Silverblatt had instructed Morris to tell Regina Planes that the temporary restraining order existed, which instruction explains the confidence with which Morris confirms that Regina "specifically" asked about the "restraining order." (Tr. at 27:6–8; 16:10–12)

And Regina Planes's testimony contains contradictions and improbabilities, each of which saps the testimony of credence. First, Regina Planes incredibly denies seeing the words "temporary restraining order" despite admittedly conversing with Morris while Morris placed the binders in the trunk. (Tr. at 194:8–17) By placing the binders next to each other, Morris displayed an array of three prominent iterations of "**TEMPORARY RESTRAINING ORDER**." Morris testified that, upon placing the binders in the trunk, Regina Planes "noticed" and appeared "surprised" by the words "temporary restraining order." (Tr. at 25:4–6) ("I placed the binders in there, and that's when she noticed the temporary restraining order language.") Although Regina Planes testified that Morris placed the binders behind a "panel" — a net to prevent items from "flipping out" when the trunk opens — Regina Planes never testified that the "panel" blocked her view of the binders. (Tr. at 181:25–182:6)

Second, Regina Planes neither denies nor clarifies Morris's attributing to Regina Planes the question "What is this restraining order about?" In fact, Regina Planes corroborates every portion of the conversation as recounted by Morris except Regina Planes reportedly cannot remember the statement that prompted Morris to mention Silverblatt's name. (Tr. at 194:8–13) ("I was walking, something — he — I don't know, Mr. Silverblatt's name came up. I don't know if he said these are from Mr. Silverblatt or whatever, I don't know.") However, Morris testified that he stated Silverblatt's name in response to Regina Planes's question "What is this restraining order about?" Regina Planes unconvincingly denies the portion of her conversation with Morris that both prompted Morris to mention Silverblatt's name and provoked Regina Planes to call Silverblatt an "asshole." (Tr. at 194:8–13)

Third, Regina Planes denies seeing the cover sheet after retrieving the binders from the SUV and delivering the binders to William Planes. Regina Planes testified that, after returning home at about 5:00 p.m., she retrieved one binder from the trunk and placed the binder on the floor in William Planes's home office. (Tr. at 199:2–6) Regina Planes testified that, after placing the binder on the floor, she announced the presence of the binder to William Planes, retrieved the remaining two binders from the trunk, and placed the other two binders on the floor. (Tr. at 199:6–7) Despite retrieving the three binders in two separate trips and placing each binder on the floor, Regina Planes testified that she never saw the cover sheet of a binder. (Tr. at 199:21–200:9) And despite reportedly not seeing the cover sheet of a binder, Regina

Planes testified that, when she placed each binder on the floor, she knew that William Planes could see the cover sheet of each binder. (Tr. at 200:3–15) ("The Court: [U]nless you must have turned them upside down somewhere, the temporary restraining order must then have been displayed for him to see. Did he see it? The Witness: For him to see it, yeah, he looked — he was looking at it and I walked out.") Regina Planes's testimony is implausible and piece-by-piece dismantles confidence in her truthfulness.

Fourth, Regina Planes testified that she largely ignored the binders because she believed that the binders pertained to the *South Capital* action. But Regina Planes accepted service of the binders on behalf of both William Planes and Ana Planes, knew that neither was a party to the *South Capital* action, and admitted that Ana Planes had "no relationship" with South Capital Construction Inc. (Tr. at 189:7–190:1) Regina Planes admits that she "never got three-ring binders from anybody." (Tr. at 183:22–184:1, 195:23–196:2) ("No, nobody has ever presented me with a three-ring binder, let alone three of them.") Regina Planes's testimony — that she greeted with steely indifference the receipt of three, large binders hand-delivered by the Department of Justice, labeled "**TEMPORARY RESTRAINING ORDER**," and directed to Regina Planes, her husband, and her daughter — is implausible in the extreme. She and her husband have been pursued by the IRS for several years and each is a veteran litigant and a skilled dissembler. The United States demonstrates by clear and convincing evidence that Regina

Planes — immediately upon delivery of the binders — knew about the temporary restraining order.

**Regina tells William Planes about the temporary restraining order**

With the binders in the trunk of the SUV, Regina Planes left her residence at approximately 12:45 p.m. and drove for about one hour to a dance class in St. Petersburg, Florida. (Tr. at 181:16–21) At 1:41 p.m. Regina Planes tried unsuccessfully to call William Planes. (Doc. 187-2 at 4; U.S. Ex. 7) At 1:43 p.m. William Planes called and spoke with Regina Planes for about seven minutes. (Doc. 187-2 at 4; U.S. Ex. 7) Regina Planes testified that she told William Planes that "a man came and gave me . . . three three-ring binders, one for me, one for you, and one for Ana." (Tr. at 183:4–8) And William Planes testified that, during the 1:43 p.m. call, Regina Planes told William Planes (1) that Morris "approached [Regina Planes's] car when she was leaving;" (2) that Morris "said he had a binder;" (3) that Regina Planes agreed to accept binders on behalf of herself, William Planes, and Ana Planes; (4) that Regina Planes "got out and . . . opened the hatch and . . . got back in her car;" and (5) that Regina Planes "instructed [Morris] to put it in the back of the SUV and . . . to close the hatch." (Tr. at 151:20–152:12) That is, Regina Planes described to William Planes each aspect of Morris's service.

Immediately after the call with Regina Planes, William Planes attempted three times to call two lawyers, Michael Brundage and Aubrey Dicus. (Doc. 187-2 at 4; U.S. Ex. 7) Immediately after Brundage and Dicus failed to answer, William Planes

called and spoke with Regina Planes for five minutes. (Doc. 187-2 at 4; U.S. Ex. 7) Four minutes later, William Planes again called Dicus, who failed to answer.

At 3:13 p.m. William Planes called the president of Flagship Community Bank, which manages the LCCs' accounts. (Doc. 187-2 at 4; U.S. Ex. 7) At 3:20 p.m. William Planes used a Coast-to-Coast email account to email Flagship and request that Flagship transfer to Coast-to-Coast $101,000 from 32801-15 Holdings, $39,000 from 2801 Corner, and $20,000 from 2801 Keystone. (Doc. 127-10) The transfer left the LLCs' account with a collective $1,512.37; 99% of the money the LLCs had deposited. (Docs. 127-9, 127-10, 127-11)

Clear and convincing evidence establishes that Regina Planes knew about the temporary restraining order when calling William Planes. But the Planeses deny that Regina Planes mentioned during twelve minutes of conversation — in which Regina Planes described each aspect of Morris's service and answered William Planes's questions about the service — that the binders, which were delivered by a stranger and addressed to the Planeses' family, bore the words "**TEMPORARY RESTRAINING ORDER**," words which — as demonstrated by Regina Planes's remarking about them to Morris — startle and impress the mind of any observer.

Further, William Planes's conduct — immediately calling his lawyers and transferring 99% of the LLCs' assets — plus the implausibility of the explanation for the transfer defeats the credibility of William Planes's testimony and confirms that William Planes knew about the temporary restraining order. Immediately after

ending the 1:43 p.m. call with Regina Planes, William Planes attempted three times to call two lawyers, Brundage and Dicus. (Doc. 187-2 at 4; U.S. Ex. 7) The immediacy of the calls and William Planes's calling two lawyers shows that information conveyed by Regina Planes spurred William Planes to action. William Planes testified that he called Brundage and Dicus either to discuss the LLCs' business or to discuss the *South Capital* action — neither of which were reportedly discussed during the call between William and Regina Planes. William Planes explained neither an urgent business matter reportedly precipitating the call to his lawyers nor an urgent matter pending in the *South Capital* action that necessitated a discussion with his lawyers.[1]

Finally, the timing of the transfer, the magnitude of the transfer, the inability to plausibly explain the transfer, and the obvious motive to evade the temporary restraining order combine item-by-item to defeat the credibility of William Planes's denial. About an hour and fifteen minutes after speaking with Regina Planes, William Planes called the president of Flagship bank and emailed the bank to request the $160,000 transfer — which is not an unaccountable and providential coincidence but the desperate ploy of an experienced, dextrous, and resolute debtor. (Doc. 187-2 at 4; U.S. Ex. 7)

---

[1] William Planes testified that he generally had "ongoing discussions" with Brundage about the *South Capital* action. But the district court in the *South Capital* action had already entered a final order and judgment. (Tr. at 140:16–19) (*South Capital*, Doc. 139) Although Regina Planes appealed the order, the parties had fully briefed the appeal thirty-three days earlier and were awaiting the Eleventh Circuit's ruling. *See United States v. Regina M. Planes*, 18-11090 (11th Cir. 2018).

Attempting to explain the amount of the transfer, William Planes testified that 2801 Keystone owed Coast-to-Coast a $330,000 brokerage commission for the sale of a school in Tarpon Springs, Florida and that the transfer was a "partial payment" of the commission. (Tr. at 50:2–5; 96:10–16) During a deposition, however, Santella testified that he had "deferred" the commission until January 2019, the month that the purchaser, Solid Rock, had to begin remitting mortgage payments to 2801 Keystone. (Tr. at 50:6–20; 135:20–136:2) Further, 2801 Corner Holdings earned the $160,000 from the sale of an office building in Palm Harbor, Florida. (Tr. at 96:17–20) Neither Santella nor William Planes explained why money earned by 2801 Corner Holdings applies to a commission that 2801 Keystone owes Coast-to-Coast. And no evidence shows that gratuitously accelerating by two months the payment of the commission — which payment left the LLCs with $1,512.37 — benefitted the LLCs.

Attempting to explain the timing of the transfer, William Planes testified that the sale of the office building closed earlier than anticipated and that on November 2, 2018, William Planes had "teed up" the transfer to Coast-to-Coast. (Tr. at 97:13–21) No documentary evidence supports William Planes's "teeing up" a transfer, and the explanation contradicts William Planes's deposition testimony that he delayed the transfer until November 7, 2018, because he "forgot." (Doc. 127-1 at 1–13) ("Q. Okay. So why wait until the 7th to make the payment? A. For the same reason Regina doesn't want to leave me at home alone, scared that I'll burn

down the house. I forget things. And I put it off when I shouldn't have put it off, and I was reminded that I had to get them paid.") The explanation for the hasty transfer is an unpersuasive and transparent contrivance. William Planes was motivated to defeat the temporary restraining order by transferring money to Coast-to-Coast, which a friend owns and which lends money to the Planeses for legal and personal expenses. In fact, a few days after the transfer Coast-to-Coast lent William Planes $55,000. (Tr. at 115:11–17)

The transfer comports with the Planeses' history of nimble but bold improvisations, undertaken to frustrate creditors. William Planes admittedly recorded a "deed-in-lieu" during a sheriff's sale to stall foreclosure and engineered a quiet-title action to circumvent an IRS lien against an LLC. (Doc. 63-6 at 3–8) In fact, one of William Planes's lawyers, Steven Tsangaris, describes theses transactions as a "virus" and explains that William Planes engineered the quiet-title action "so that big bro don't come snooping around with another fraudulent conveyance issue." (Doc. 187-20, U.S. Ex. 43) Further, the transfer comports with Judge Bucklew's finding that William Planes engineered a fraudulent transfer to prevent the IRS from collecting South Capital's tax liability.

Regina Planes knew about the temporary restraining order, Regina Planes talked with William Planes one hour before William Planes transferred 99% of the money held by the LLCs bound by the order, William Planes had a motive to evade the order, and the Planeses' explanations lack credibility, plausibility, and persuasive

force. Clear and convincing evidence establishes that William Planes knew about the temporary restraining order immediately before transferring the $160,000.

**Santella's involvement**

At the June 5, 2019 hearing, the United States presented no evidence showing that Santella knew about the temporary restraining order when William Planes transferred the money to Coast-to-Coast or that Santella facilitated the transfer. Rather, the United States argued that Santella permits William Planes to maintain a "slush fund" within Coast-to-Coast and that Coast-to-Coast's conduct both before and after the transfer establishes the existence and the utility of the slush fund. (Doc. 127 at 5–6) Also, the United States argues (unpersuasively) that Santella's failing to unwind the transaction and spending the transferred money are contemptuous of the order.

The United States shows that, before receiving the $160,000, Coast-to-Coast (1) paid the Planeses' lawyers about $32,000 to defend Regina Planes in the *South Capital* action, (2) paid for William Planes's Jaguar automobile, (3) paid for occasional maintenance on the Planeses' residence, and (4) permitted William Planes to use an office at Coast-to-Coast. (Docs. 21 at 1–6, 127-1; Tr. at 46:8–9, 76:16–77:9)

And the United States shows that, after receiving the $160,000, Coast-to-Coast (1) lent William Planes about $55,000 to retain lawyers for this action, (2) paid Santella about $23,000 for services, (3) spent $2,200 for Coast-to-Coast's Christmas party, (4) paid $ 1,357.48 toward William Planes's Jaguar, (5) spent $1,450 at

"Absolutely Optical Tampa," and (6) spent $41.72 at a Publix Super Market. (Tr. at 44:8–49:15) Bank records show that Coast-to-Coast spent the remainder of the $160,000 on payroll and other business expenses. (Doc. 127-17 at 1–12)

The United States presents no evidence showing that the payments for the Christmas party, to Publix Super Market, or to Absolutely Optical benefitted the Planeses. Denying the existence of a slush fund, Santella testified that the payments were loans and that Coast-to-Coast has provided perquisites — the luxury automobile, the office, and the occasional household maintenance — to William Planes putatively in exchange for William Planes's "bringing in" brokerage opportunities for Coast-to-Coast. (Tr. at 33:24–34:2; Doc. 127-21 at 4–6) Of course, no promissory note or other paper memorializes the $55,000 interest-free loan to William Planes, but Santella claims that documentation is unnecessary because William Planes has "always repaid" loans from Coast-to-Coast. (Tr. at 59:24–60:2; 60:14–15) Although Coast-to-Coast's paying for the Planeses' legal expenses, occasional household maintenance, and luxury automobile emits the distinct and familiar malodor of graft, the evidence presented at the June 5, 2019 hearing fails to establish by clear and convincing evidence that Coast-to-Coast and Santella maintain a "slush fund" for William Planes.

On December 21, 2018, the United States garnished Coast-to-Coast's two bank accounts. (Docs. 59, 60) Upon service of the garnishment writ, Coast-to-Coast's accounts contained a collective $16,194.84. (Doc. 162 at 3) The United States

asserts that Coast-to-Coast failed to disclose two escrow accounts at Valley National Bank. (Tr. at 53:8–11) Santella testified that Bill McLaughlin, a former Coast-to-Coast employee, operates the account and that Santella had instructed McLaughlin to close the account after McLaughlin resigned from Coast-to-Coast and joined another entity owned by Santella. (Tr. at 61:16–65:25) Santella testified that he was unaware until the morning of the show-cause hearing that McLaughlin continued to operate the account. (Tr. at 61:16–65:25) The United States offers no persuasive evidence contradicting Santella's testimony that, although titled in Coast-to-Coast's name, Santella Realty LLC — acting through McLaughlin — owns and operates the Valley National accounts. (Tr. at 61:16–65:25)

## CONCLUSIONS OF LAW

Under Rule 65(d)(2), Federal Rules of Civil Procedure, an injunction binds a person "who receive[s] actual notice of [the injunction] by personal service or otherwise." A person has actual notice if the person knows "of the mere existence of the injunction — not its precise terms." *F.T.C. v. Neiswonger*, 494 F. Supp. 2d 1067, 1079 (E.D. Mo. 2007). A party who learns about an injunction cannot "maintain a studied ignorance of the terms of the decree in order to postpone compliance and preclude a finding of contempt." *Perfect Fit Indus., Inc. v. Acme Quilting Co.*, 646 F.2d 800, 808 (2d Cir. 1981). To establish contempt, the moving party must demonstrate by clear and convincing evidence that "(1) the allegedly violated order was valid and lawful; (2) the order was clear and unambiguous; and (3) the alleged violator had the

ability to comply with the order." *Georgia Power Co. v. NLRM*, 484 F.3d 1288, 1291 (11th Cir. 2007). The "clear and convincing" standard requires a showing greater than a preponderance of the evidence but less than beyond a reasonable doubt. *Georgia Power*, 484 F.3d at 1291.

The United States establishes by clear and convincing evidence that the temporary restraining order was valid, lawful, clear, and unambiguous. Accordingly, the United States shows contempt if clear and convincing evidence establishes that William Planes, Santella, or Coast-to-Coast (1) had actual notice of the temporary restraining order, (2) violated the temporary restraining order, and (3) could comply with the order.

### William Planes

The United States establishes by clear and convincing evidence that William Planes had actual notice of the temporary restraining order. Regina Planes learned about the temporary restraining order from Morris, Regina Planes's denial lacks credibility, and the circumstantial evidence presented by the United States clearly and convincingly shows that Regina Planes told William Planes about the order. William and Regina Planes discussed the binders and service for twelve minutes, William Planes immediately afterward called his lawyers, and William Planes soon afterward transferred 99% of the money bound by the temporary restraining order. The Planeses' transparent motive to transfer the assets, persistent efforts to defeat tax collection, and failure to plausibly explain their conduct collectively dismantle the

credibility of the Planeses' testimony.  The United States establishes by clear and convincing evidence that William Planes knew about the temporary restraining order before directing the transfer.  *Neiswonger*, 494 F. Supp. 2d at 1079 ("Circumstantial evidence establishing 'actual knowledge' may be derived from the parties' relationship, concert of action in maintenance of the unlawful business, and 'the obvious interest of the defendants in evading any interference with their unlawful business as long as possible.'")

And the United States shows by clear and convincing evidence that William Planes violated the terms of the temporary restraining order and had the ability to comply with the order.  The order prohibits William Planes from "transferring . . . the assets of any of the . . . entities," including 2801 Corner Holdings, 2801 Keystone, and 32801-15 Holdings.  And on November 7, 2019 at 3:21 p.m., William Planes voluntarily directed Flagship Bank to transfer to Coast-to-Coast $101,000 from 32801-15 Holdings, $39,000 from 2801 Corner Holdings, and $20,000 from 2801 Keystone.  (U.S. Ex. 20 at 1)  William Planes is in contempt of the temporary restraining order.

### Coast-to-Coast

The United States argues that, because William Planes is a director and used a Coast-to-Coast email account to transfer the $160,000, William Planes's knowledge of the temporary restraining order is imputed to Coast-to-Coast.  Florida law imputes to a corporation the knowledge of an agent acting on behalf of the corporation.  *Beck*

*v. Deloitte & Touche*, 144 F.3d 732, 736 (11th Cir. 1998) (citing *Seidman & Seidman v. Gee*, 625 So. 2d 1, 2 (Fla. 3d DCA 1992)).  If the knowledge is "material to the agent's duties to the principal," knowledge is imputed even if the agent acquired the knowledge "casually or through experiences" separate from the performance of a duty for the principal.  *Restatement (Third) of Agency* § 5.03 cmt. e (2006); *accord Restatement (Second) of Agency* § 279 cmt. e (1958).  Knowledge is not imputed, however, if the agent acts "entirely adversely" to the corporation.  *Chang v. JPMorgan Chase Bank, N.A.*, 845 F.3d 1087, 1095–96 (11th Cir. 2017).  An act is entirely adverse if the agent neither intended to benefit the corporation nor created a "short- or long-term benefit to the corporation."  *Beck*, 144 F.3d at 736.

William Planes, a director of Coast-to-Coast, possessed the actual authority to accept the transfer on behalf of Coast-to-Coast.  Although William Planes learned in a casual circumstance about the temporary restraining order, knowledge about the order is material to William Planes's duty to Coast-to-Coast because Coast-to-Coast routinely provides brokerage services for William Planes, and the order prohibits non-parties from participating in a transfer with the LLCs.  And the contemptuous transfer is not "entirely adverse" to the corporation because Coast-to-Coast benefitted from receiving the $160,000.  *Beck*, 144 F.3d at 736.  William Planes's knowledge is imputed to Coast-to-Coast.  Under Rule 65(d), Federal Rules of Civil Procedure, Coast-to-Coast — by knowingly accepting the transfer — was "in active concert or participation" with William Planes's violation of the temporary restraining order.

The United States demonstrates by clear and convincing evidence Coast-to-Coast's contempt.

## Santella

The United States argues that Santella, the owner and president of Coast-to-Coast, violated the temporary restraining order by facilitating the transfer. But the United States elicited no testimony showing that Santella knew about the temporary restraining order before William Planes transferred money to Coast-to-Coast, that Santella assisted the transfer, or that Santella knew that William Planes had contemptuously transferred the money. And although William Planes's knowledge about the temporary restraining order is imputed to Coast-to-Coast, a principal's knowledge "is not imputed downward to an agent." *Restatement (Third) of Agency* § 5.03 cmt. g (2006) ("This protects the agent from the legal consequences of facts that only the principal knows or has reason to know.") Santella did not knowingly facilitate the transfer, and Coast-to-Coast's knowledge is not imputed to Santella.

Alternatively, the United States argues that Santella is in contempt both by failing to unwind the transaction and by directing Coast-to-Coast to spend the $160,000. Although the United States broadly describes the injunction as an "asset freeze," the injunction prohibits the Planeses from transferring the assets of the LLCs — not the assets of Coast-to-Coast. Absent clear and convincing evidence that Santella knowingly aided William Planes's violation, that is, that Santella either (1) spent the transferred money despite knowing that William Planes had

contemptuously transferred the money or (2) knowingly held the money as a nominee for the LLCs, Santella's later spending neither violates the express prohibition of the temporary restraining order nor constitutes "active concert or participation." Santella's obligation to show cause (Doc. 141) is **DISCHARGED**.

Also, the United States contends for a constructive trust against the $23,000 that Coast-to-Coast paid Santella. A constructive trust "is an equitable remedy used to restore a beneficiary's interest in property wrongfully taken, as well as to prevent unjust enrichment of culpable parties." *Am. Nat'l Bank of Jacksonville v. FDIC*, 710 F.2d 1528, 1541 (11th Cir. 1983). The constructive trust reaches "property either in the hands of the original wrongdoer, or in the hands of any subsequent holder," unless the subsequent holder is a "bona fide purchaser." *Harris Trust & Savs. Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238, 251 (2000). Under Florida law, a purchaser is "bona fide" if the purchaser "(1) acquired the legal title to the property in question, (2) paid value therefore, and (3) [lacked] knowledge of the equity against the property at the time when consideration was paid and title acquired." *DGG Dev. Corp. v. Estate of Capponi*, 983 So. 2d 1232, 1234 (Fla. 5th DCA 2008).

The United States argues that equity impresses an equitable trust on the $23,000 that Coast-to-Coast paid Santella but cites no authority supporting the imposition of a constructive trust — a claim typically pleaded in the complaint — either as a summary remedy against a non-party or as an alternative to contempt. And the United States fails to show by clear and convincing evidence either that

Coast-to-Coast paid Santella in exchange for no consideration or that Santella knew of the "equity against the property," that is, that Santella knew that William Planes contemptuously transferred the money.

**CONTEMPT REMEDY**

A district court enjoys "wide discretion" to craft a remedy for civil contempt, which is measured "solely by the requirements of full remedial relief." *United States v. City of Miami*, 195 F.3d 1292, 1298 (11th Cir. 1999).  William Planes transferred $160,000 to Coast-to-Coast, which later lent William Planes $55,000 to retain lawyers for the defense of this action.  Because the United States has disclaimed recovery of the $55,000 (Doc. 174 at n.1), a payment of $105,000 from accounts not bound by the temporary restraining order would fully reimburse the United States.  However, William Planes reportedly holds minimal assets in his name, and Flagship Bank's answer to the garnishment writ shows that Coast-to-Coast has two bank accounts holding a collective $16,194.84.  (Doc. 73)  Similar to a party who is enjoined to produce documents and who elects to burn the documents instead, the contemnors have — through the contemptuous transfer — likely precluded the contemnors' ability to fully reimburse the United States.  In this circumstance, a sanction is "an important means of vindicating the court's authority" and reimbursing the plaintiff.  *Chandler v. James*, 180 F.3d 1254, 1273 (11th Cir. 1999) (Tjoflat, J.) (concurring specially).  The United States has requested two remedies, each of which would compensate for the contempt.  First, the United States requests

(Doc. 5 at 3) an accounting of LLCs' assets from the day of the judgment in the *South Capital* action.  Second, the United States requests (Docs. 5, 144) to convert the temporary restraining order into a preliminary injunction.

**William Planes is sanctioned for contempt as follows:**

1.     William Planes's conduct demonstrates an acute likelihood that — absent continued restraint — William Planes will continue to dissipate the entities' assets.  A continuation of the injunction is warranted both as a compensatory remedy to the United States and because the United States demonstrates a substantial likelihood that William Planes is liable for the tax assessments,[2] that William Planes "dominates and controls" the trusts and the LLCs,[3] that

---

[2] The tax assessments against William Planes—which exceed $9,000,000—are presumptively valid. *United States v. White*, 466 F.3d 1241, 1248 (11th Cir. 2006). Although the United States must sue within ten years to reduce an assessment to judgment, the United States shows a substantial likelihood that, under 26 U.S.C. §§ 6320(c) and 6330(e)(1), William Planes tolled the statutory limitation by appealing assessments—which total $4,457,333.68—to the tax court. (Doc. 86-3; 86-4) Regardless, the United States timely sues within ten years for the assessments in Counts VI–XV, which total $3,115,621.54. Also, the defendants assert that the United States overstates the tax liability by "at least $3 million." (Doc. 161 at 3–4)  Even if correct, the defendants offer no evidence showing that the LLCs' assets exceed $6,000,000.

[3] To disregard corporateness, the United States shows that William Planes (1) "dominated and controlled" an entity lacking an "independent existence," (2) used the entity's form "fraudulently or for an improper purpose," and (3) harmed the United States. *Gasparini v. Pordomingo*, 972 So. 2d 1053, 1055 (Fla. 3d DCA 2008). William and Regina Planes created the trusts on May 6, 2003, a day after the IRS assessed a $529,000 tax penalty against William Planes. (Docs. 6 at 26–28, 54–56; 3-7 at 2, 11) The United States shows a substantial likelihood that, from December 2000 to March 2003, William Planes knew that companies he managed were accruing substantial liability for unpaid employment taxes. (Doc. 63-1 at 2–48) The timing shows that William Planes likely both formed and intended to use the trusts and LLCs to shield assets from collection.

And although the trusts limit the Planeses to $14,000 per month, the United States shows that William Planes has used trust assets (1) to fund personal cashiers' checks, (2) to purchase a $57,273.48 Mercedes, and (3) to assume a $127,252.74 debt owed by Regina Planes. (Docs. 9, 10,
(continued...)

- 28 -

William Planes exploits the entities' form to defeat creditors,[4] and that the United States will suffer irreparable injury[5] absent continued restraint. Accordingly, the temporary restraining order (Doc. 6) is **CONVERTED** — both as a sanction for contempt and as warranted by the United States' showing in the motion — to a preliminary injunction, and the United States' motion (Doc. 5) for a preliminary injunction is **GRANTED**.

2.     William and Regina Planes — as well as anyone acting on the Planeses' behalf or in concert or participation with the Planeses — are **PRELIMINARILY**

---

[3] (...continued)
11) Also, the United States shows that William Planes routinely disregards the distribution limit. (Docs. 144-3 at 3–6, 16–17) For example, in November 2017, William Planes (1) withdrew $7,981.83 from 03-22-18 Holdings LLC to pay the Planeses' personal credit card expenses, (2) withdrew $2,567.05 from Corklico LLC to pay health-care expenses, (3) withdrew $4,000 from 2801 Corner Holdings LLC, and (4) transferred $29,020 from 2801 Corner Holdings to Quality Holdings of Florida—wholly owned by Regina Planes—and spent most of the $29,020 on personal expenses. (Docs. 144-1 at 1; 144-2 at 1; 144-3 at 3–6, 16–17) The November 2017 transactions are hardly aberrant. The defendants proffer no plausible explanation for these and other similar transactions, which show a substantial likelihood that "corporate property was converted [and] the corporate assets depleted for the personal benefit" of the Planeses, *Dania Jai-Alai Palace, Inc. v. Sykes*, 450 So. 2d 1114, 1120 (Fla. 1984) (quoting *Advertects, Inc. v. Sawyer Industries, Inc.*, 84 So. 2d 21, 24 (Fla.1955)).

[4] The United States shows that at a November 18, 2018 foreclosure auction of real property controlled by William Planes and held by Trinity Corner LLC, William Planes conveyed title to Corklico LLC—an entity controlled by William Planes—to "stall" the foreclosure sale. (Doc. 63-6 at 3) Later, the United States filed a tax lien against Corklico as the "alter ego" of William Planes. William Planes admittedly circumvented the lien by suing Corklico in state court and stipulating to quiet title to the real property in favor of 2801 Keystone LLC—another entity controlled by William Planes. Remarkably, the defendants admit to conveying the Keystone property to frustrate a creditor's ability to collect a judgment and admit to filing the quiet title action to circumvent the IRS's tax lien. (Doc. 63-6 at 3–6) These ready admissions show a substantial likelihood that William Planes abuses the corporate form and treats the LLCs as interchangeable husks to frustrate creditors.

[5] William Planes's (1) transferring the $160,000 an hour after learning about the temporary restraining order, (2) engineering a fraudulent transfer in the South Capital action, and (3) transferring property to frustrate creditors and to circumvent an IRS lien demonstrate an acute likelihood of irreparable injury absent continued restraint.

**ENJOINED** from directly or indirectly encumbering, liquidating, transferring, spending, diminishing, or otherwise disbursing the assets of the following entities:

     i.     The William Planes 2003 Irrevocable Trust;

     ii.     The Regina M. Planes 2003 Irrevocable Trust;

     iii.     Corklico LLC;

     iv.     3-22-18 LLC;

     v.     2801 Corner Holdings LLC;

     vi.     32801-15 Holdings LLC;

     vii.     2801 Keystone LLC;

     viii.     Trinity Corner LLC; and

     ix.     Quality Holdings of Florida Inc.

3.     Effective **JULY 11, 2019**, William and Regina Planes may withdraw from the entities listed above no more than a collective $14,000 per month for the payment of personal expenses. The Planeses are prohibited from incorporating an entity, incurring new credit charges, opening lines of credit, or obligating the Planeses for a major purchase without advance approval by the United States. No later than **JULY 25, 2019**, the defendants must file evidence of their anticipated business expense. The defendants must confer in good faith with the United States about the anticipated expense, and the

United States may object no later than seven days after the defendants file evidence of anticipated business expense.

4.    No later than **OCTOBER 31, 2019**, William Planes must:

    a.    Pay from assets not subject to the injunction

        i.    $46,000 to 32801-15 Holdings LLC,

        ii.    $39,000 to 2801 Corner Holdings LLC, and

        iii.    $4,000 to 2801 Keystone LLC;

    b.    Provide the United States with a written explanation of the payments' source; and

    c.    File a notice describing William Planes's compliance.

5.    If William Planes fails to timely pay 32801-15 Holdings LLC, 2801 Corner Holdings LLC, and 2801 Keystone LLC, an order will require William Planes to provide the United States with an accounting of transfers from each entity bound by the preliminary injunction.

6.    William Planes is **FINED** for an amount to be determined after William Planes either repays the LLCs or provides the United States with an accounting.

**Coast-to-Coast is sanctioned for contempt as follows:**

No later than **OCTOBER 31, 2019**, Coast-to-Coast must pay $16,000 to 2801 Keystone LLC from assets not subject to the injunction and must file a notice describing Coast-to-Coast's compliance.  The prejudgment garnishment (Docs. 60,

61) against Coast-to-Coast is **MODIFIED** as follows. No later than **OCTOBER 31,**

**2019**, Coast-to-Coast must transfer to 2801 Keystone LLC a total of $16,000 from the

Flagship Community Bank accounts ending in 1020 and 1295.

No later than **OCTOBER 31, 2019**, the United States may move for expenses

incurred in pursuing William Planes's and Coast-to-Coast's contempt

## LEGAL EXPENSES

The defendants request (Doc. 173) a modification of the injunction to permit

2801 Corner Holdings LLC, a defendant, to enter a $220,000 lending agreement to

pay the defendants' legal expenses. 2801 Corner Holdings owns an option to

purchase an office building owned by Pinellas 19, Inc., a third party. (Doc. 173 at

¶ 9) 2801 Corner Holdings pays Pinellas 19 a monthly operating fee and collects

rents on the property. (Doc. 173 at ¶ 9) Evergreen Industrial Park LLC, a third party

managed by Gene Santella, has reportedly obtained an $800,000 loan to purchase

Pinellas 19 for $480,000. (Doc. 173 at ¶ 10) After purchasing Pinellas 19, Evergreen

plans to lend 2801 Corner Holdings $220,000 in exchange for a $320,000 increase in

the option price and a $1,000 to $3,000 increase in the monthly operating fee.

(Doc. 173 at ¶ 11)

The United States objects to the requested modification. First, the United

States argues that the amount of remaining assets militates against permitting a

$320,000 encumbrance. Second, the United States argues that William Planes likely

controls Evergreen and intends to use the lending agreement to evade the injunction.

The United States appends a declaration in which Gary Blackwell, the owner of Pinellas 19, testifies that William Planes "approached [Blackwell] about Evergreen Industrial Park LLC purchasing the stock of Pinellas 19 Inc." and that "[William Planes] is the only person that [Blackwell] know[s] of who is associated with Evergreen Industrial Park LLC."  (Doc. 188-1 at ¶ 8)  Third, the United States asserts that in January 2019 William Planes encumbered the option owned by 2801 Corner Holdings and argues that equity "close[s] the door on any attempt . . . to seek relief" from the injunction.  *S.E.C. v. Lauer*, 445 F. Supp. 2d 1362, 1367 (S.D. Fla. 2006).  Blackwell testifies that in January 2019 Pinellas 19 loaned William Planes $75,000 in exchange for an $80,000 increase in the option price and a $500 increase in the monthly operating fee.  (Doc. 188-1 at ¶¶ 2–3)  William Planes reportedly used the loan to pay the Planeses' counsel a $40,000 retainer.  Despite the pendency of the temporary restraining order, no party requested leave before encumbering 2801 Corner Holding's option.

Tellingly, the defendants fail (1) to describe the defendants' affiliation with Evergreen, (2) to explain why $220,000 constitutes a reasonable estimate of legal expenses, (3) to explain the $100,000 difference between the increase in the option price and the amount of the loan, or (4) to explain why the January 2019 encumbrance was not contemptuous of the temporary restraining order.  The motion (Doc. 173) to modify the injunction is **DENIED WITHOUT PREJUDICE**, and the motion (Doc. 201) to expedite is **DENIED AS MOOT**.

Finally, the United States moves (Doc. 188) to require the Planeses' counsel to deposit the $40,000 retainer into a trust account and assert that the Planeses' counsel failed to investigate reasonably the source of the retainer. The motion (Doc. 188) is **REFERRED** to Magistrate Judge Thomas Wilson for a report and recommendation. Because the "trust defendants'" response (Doc. 198) to the motion contains confidential information from mediation and primarily addresses matter irrelevant to the motion, the United States' motion (Doc. 200) to strike is **GRANTED**, and the response (Doc. 198) is **STRICKEN** for violating Local Rule 9.07(b). The clerk is **DIRECTED** (1) to file as a new docket entry pages one through six of document 198, (2) to file under seal pages seven through thirteen of document 198, and (3) to delete the image of document 198 from the public docket. At least three times Brundage has filed a paper (Docs. 152, 158, 198) that demonstrates either blatant disregard for, or contempt of, the Local Rules. **ANOTHER VIOLATION MIGHT WARRANT A SANCTION**.

ORDERED in Tampa, Florida, on July 11, 2019.

_____
STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE